Good morning. We have four cases this morning and the first is number 17-1958 in the Energy Future v. Wilmington Trust. And may it please the Court, I've asked to reserve five minutes for rebuttal. That's fine. Let me start off with Section 4.1 of the Inter-Predator Agreement. The first one looks like it is for LC fees. You've got five categories here, five levels. And we call it a waterfall. So I assume that all of number one has to be paid before you go to number two. Is that right? Correct. Sort of like the absolute priority rule concept. Correct. And again, I'm assuming number one is something like LC fees. But is there anything else you can think of that would be paid? Well, the way it's drafted actually, it's everything minus amounts payable in connection with any unreimbursed amount under any letter. So it would be fees. It could be interest on amounts that have not yet been reimbursed to the letter of credit issuer. But it's anything effectively other than the principal amount of LC. And the second is unpaid drawing. So there's a drawing, but it's not reimbursed. Is that right? Correct. And the third is somebody in effect fronts the fees or whatever it might be. I guess it is fronting the fees that are owed to the issuer. Correct. So now we're down to four. And you have deposit LC obligations. And you go to the definition of deposit LC obligations. And you have – what is that definition there? That definition is a formula. It's a sum of two parts. The first part is the stated amount of outstanding letters of credit. And the second part is unpaid drawings on letters of credit that are no longer outstanding because they've been drawn or they are outstanding and part of it has been drawn. Got it. So let's focus on the first one. The stated amount of any letter of credit shall mean the maximum amount from time to time available to be drawn. So it hasn't been drawn yet. And it's determined without regard to any conditions. Or it's come back able to be drawn because something's expired. Exactly. Correct. But you've got amounts outstanding that could be drawn, have not yet been drawn, or are somehow recaptured and could be used again for another day. Correct. So why isn't that game set and match? Well, in the definition of deposit LC obligations, that gives you an amount of money. And it's an amount of money that was lent by my clients, the deposit LC lenders. But that amount relates to what? Unreimbursed LC's? Unreimbursed LC's. Undrawn LC's. Correct. And who did you lend money to? To TCEH, the borrower. Right. Exactly. And that money was placed into the segregated account. Correct. And that money sits there. It's required to sit there until there's a rule in this document that allows it to be released. But what would tie the stated amount of all outstanding deposit letters of credit to the amount that you loaned to TCEH? The sole purpose of the money that we loaned was in order to fund those letters of credit. Eventually. Eventually. But the amount, stated amount of outstanding deposit letters of credit is really as between the letter of credit issuer and those who have drawn on it. Not exactly. It's really a three-way relationship. The size of the letter of credit sub-facility is the size that's requested by the borrower because it thinks it's going to request letters of credit in that total $1.25 billion amount. So you're tying it to the size, but shouldn't it really say the lenders? The amount that the lenders should be able to recover from TCEH because the money was put in and there's the stated amount? I mean, there's a little extrapolation here that you're trying to jump from what you've loaned TCEH over there. I mean, it could be clearer, correct, that it's the lenders, not? Absolutely, it could be clearer. Our position is that these documents are ambiguous because they fail to name a payee of these obligations. And I think both sides agree. I think the lower courts agree that the best we can do here is infer from other provisions of these documents the right payee of deposit LC obligations. It sounds like from what you said on page four of your opening brief that if we were to have thought, if somebody, not we, but whoever drafted this, was to have thought about this, that the people who put the money in or loaned the money into the particular segregated account or the sum $1.25 billion, they would be preferred. That makes sense. But that's not necessarily what the documents say. The other side would say, okay, these are for contingent obligations on the fourth level, which would be, for example, undrawn letters of credit. And yet it appears that you only deal with it on page 39 of your opening brief and I guess note 20 on page 40. But it looks like, you know, my question is why do we even get to any analysis of 3.9 of the credit agreement when the intercredit agreement of 4.1b seems to answer the issue? I don't think it does answer the issue. You started with saying that why wasn't it clear that there's a special right of the deposit LC lenders in these documents? The fact is it is clear that there's a special right. These documents make it very clear that all of the money that they lent went into the segregated account. Two, that money is locked up. Section 3.9 says no person can make any withdrawal from that account except if this document says so. This document allows TCEH to take money out of that account. Section 5.2d and section 3.9 allow for that, but only if the deposit LC lenders are paid with that money. That's if TCEH is doing it voluntarily. Can you help me understand the definition of the deposit LC obligations here? You said earlier in your opening that that was coextensive with the exposure of the lenders. But as I understand the document and your contentions in the brief, there's always and there's required to be a positive balance in the collateral account, right? There's not required to be. The point I was making is that TCEH is borrowing at the outset of this facility $1.25 billion, and it's paying interest on that amount from day one. But that's not coextensive with the amount of the letters of credit, right? It doesn't have to be. So isn't that the problem because there is an excess in the collateral account, and the definition of the obligation is that states the exposure of the issuers, not exposure of the lenders, because even by your own definition and what appears in the deposit obligation definition, you would not have priority over the excess. How could that make any commercial sense? Well, so the way that Apolesia phrased that argument is slightly different, which is to say because appellants are arguing that the deposit LC lenders only negotiated a partial priority in this money, they should therefore get no priority in this money. And I think that actually makes no commercial sense. I can't explain to you why, without evidence, the deposit LC lenders would have negotiated for this specific amount of priority, but I can explain to you why they would not have entered into a facility like this if there had been no priority at all. But there would be, you agree the way this is drafted, there would be no priority if letters of credit, for example, had not yet been issued. If no letters of credit were ever issued under the facility? Yes, but that's a completely non-commercial result because TCH never would have borrowed and paid interest on $1.25 billion if they had never used the facility. Understood, but doesn't that drive home that the definition does not state the exposure of the lenders, it's the exposure of the issuers by the terms of the obligation? There is a hypothetical circumstance that would never arise in a normal commercial context in which that would be the case, but you can't interpret these documents in a non-commercial way. You can't interpret these documents in a non-commercial way? Correct, you must interpret these documents in a way that makes commercial sense, and it makes no commercial sense that a borrower would borrow $1.25 billion and never use the facility. Well, we can speculate at the outset as to what should have been in there, and maybe you're right in terms of what you say at the outset of your brief, but our job is to look at the contract and the definitions of the contract appear in 4.1 to support that the stated amount, which is included in LC obligations, would be undrawn LCs. It's an amount of money that could be owed, and by the way, that does make commercial sense. Right. Right, so what about the other provisions of these documents that you also have to give life to and give commercial sense? There are other provisions, including obligations, that state explicitly that they're covered in loan obligations, but that is patently absent here. So looking even at those other provisions, that seems to reinforce that the priority here in No. 4 does not relate to the lenders, but rather issuer obligations, contingent obligations around the obligations. In every other circumstance in these documents where money is coming out of this account, the deposit LC lenders are expressly given a preference to that money. If TCH takes money out of the account, the deposit LC lenders have to get that money. The only way that TCH can get money out of the account at the end when they want to take all the money out of the account is after the deposit LC lenders, not the other lenders, have been paid in full. Again, that's between you and TCH. That's that relationship, and you're now tying? No. No, not at all. This is a rule in the document to which all the lenders are a party. The last sentence of Section 3.9 says, TCH can withdraw all funds from the account if it pays the deposit LC lenders, not the other lenders. All lenders have agreed to that provision. But there again, that's not tied to the LC aspect. Well, so now look at Section 3.1e of the Intercreditor Agreement. That, through operation of 32 other times that the term required secured parties and required deposit LC lenders is used in the Intercreditor Agreement, it gives exclusive control of the segregated account to the deposit LC lenders, no other lenders. Well, maybe this provision should have said deposit LC lenders, but it doesn't. Well, deposit LC obligations should have named a payee. Yes. Why doesn't 3.1e actually show the opposite? That is that the lender's right to consent or withhold consent, that applies for priority levels 1 through 4. Why doesn't that reinforce that their rights don't come into play until level 5? That is, they don't have a priority in the first level or the second, right? How do you draw from that that they have a special priority to number 4 as opposed, for example, to the document setting it up so that the deposit LC lenders are representative lenders and have been designated simply to represent the interests of all lenders whose interests then come into play at the fifth level? I think there's actually some confusion as to what Section 3.1e really does, so if I could take a minute just to explain that. Section 3.1e, the last sentence, says, with respect to the deposit LC loan collateral, which is the segregated account we're talking about, references in the agreement to required secured parties, which is the group of people who control something, right? It's a majority vote of some group, shall be deemed references to required deposit LC loan lenders until proceeds from the deposit LC loan collateral have been applied pursuant to Section 4.1b to satisfaction of all priorities except last, which means until you've paid through that fourth level, the controlling party for the segregated account is the required deposit LC lenders. What if there's another reason that was put in there, and I guess to some extent we're guessing, but what if it may have been inserted to ensure that the general creditors do not outvote the deposit LC lenders and divert the collateral elsewhere? Why would it matter to the deposit LC lenders if the collateral is diverted elsewhere? Well, what matters to the deposit LC issuers is that their undrawn LCs have priority over something else, anything else. Right, so it's actually peculiar that the deposit LC issuers would give the deposit LC lenders the right to control this account? That's a peculiar thing, but it's not peculiar at all that if the deposit LC lenders have priority, that they're the ones controlling the account until that fourth level is paid out. And look at how that term, required secured parties, is used in the document, and I'll just give one example. Section 3.1A, the first sentence, says that it's the deposit LC lenders that, quote, have the exclusive right to authorize or direct the collateral agent to enforce, collect, or realize on that account. You know what it may go back to is, in effect, 3.1A or E, but primarily E, is maybe a backdoor argument to what was intended initially. But you have something specific, which is 4.1 of the intercreditor agreement, and 4.1B doesn't support your position. And I'm speaking only for myself. I don't find 3.9, as Judge Andrews did, to be a smoking gun. It may have some effect possibly on Mr. Friedman's side, but to me, this is about 4.1B. So how do you reconcile the fact that by the time you get to the fourth level of the 4.1B waterfall and you're paying deposit LC obligations, you've already paid all amounts that could possibly be due? Except you have amounts that could be drawn in the future, and you're still on the hook. I mean, when I drafted LC documents in the Wayback Machine, I mean, you wanted to be sure that I'm not leaving my client outstanding. If there's LCs that are not yet drawn on, my client still has to be collateralized. I mean, that's just, that's 101. There is protection like that in this document, but it comes in the preamble of Section 4.1. It says that you can only apply the waterfall after all contingencies have been resolved, after the amounts can be determined. You only run this waterfall once, and it's after those contingent obligations have been resolved. What about the second half of the definition there? Because that provides if on any date of determination a deposit letter of credit is expired by its terms, but any amount may still be drawn there under by reason of the operation of Rule 3.14 of the ISP. Doesn't that indicate that there is such a thing as a determined but still contingent amount? It does. It makes sure that the full amount of deposit LC obligations will be captured in that fourth level of the waterfall. But that doesn't mean that the deposit LC lenders haven't already been paid, because the first two levels of the waterfall, necessarily by the way that they've been constructed, it's everything is the first level except for the second level, and then the second level is everything else. But this total amount is not determined at a fixed point in time. You make the argument that there is a single one-time application of the waterfall, and so that preamble with what is determined sets things in stone. But doesn't the second part of the definition indicate that there is exposure that is determined, but it's still contingent? Not at all. Go back to the first level of the 4.1b waterfall. It says you have to pay all amounts due to the deposit letter of credit issuer under any of the financing documents. That's just everything. Why don't we hear from Mr. Friedman and get you back on the rebuttal. Thank you. May it please the Court, Peter Friedman on behalf of the appellees. Your Honor, I want to start with 3.1. Justice Scalia in American Truckman v. Whitman said you don't hide an elephant in a mouse hole. That was in reference to statutory interpretation, but I think in effect with respect to contractual interpretation, to completely deviate from the waterfall as well as Section 2.1 of the Intercreditor Agreement, which reinforces the pari passu status of parties by looking at a provision that says it's not about remedies, it's not about payment priorities, would be a classic elephant in a mouse hole. A couple of other points. Your colleague doesn't have to show with certainty that they have the right interpretation. What they're trying to show is a much lower threshold, but there's ambiguity. And given what they pointed to in 3.1e or simply in the absence of the term sure at Level 4 of the waterfall, why isn't that enough to at least create ambiguity and turn to extrinsic evidence? So under New York law, silence can't create ambiguity. And I think with 4.1b, we know the what and the who. And once you know the what and the who, there can only be one conclusion. I'm sorry, we know the what and the why. We know the what it's supposed to be, the definition of deposit LC obligations, and we know the why. We know why the deposit LC collateral account exists. We actually don't have to guess. This is a really rare contract where three times it tells you exactly why that account exists, and it's the cash collateralized secured obligations owed to deposit LC issuers. So once you know the what and the why, there's only one conclusion as to the who, and that's deposit LC obligation, deposit LC issuers. There's no one else. How does the first of the waterfall relate to the fourth? The first part of the waterfall is- And how does deposit LC obligations, that definition, really make sense? So it has two components. The first is unpaid drawings, and that clearly protects deposit LC issuers. Well, the first says payment of all amounts due to the deposit, letter, or credit issuer under any of the financing documents. Okay. Excluding amounts payable in connection with unreimbursed- Yes, so that excludes unpaid drawings. Okay. The second component is unpaid drawings, clearly designed to protect deposit LC issuers. The third, fees that have been fronted by secured parties, and the fourth is stated amount. And stated amount very clearly protects deposit LC issuers. If appellants are correct, then there is nothing left to protect contingent obligations for the people who are supposed to be the most risk-free, right? Deposit LC issuers have a special account set up to cash collateralized obligations to them. When are secured obligations determined for purposes of Section 4.1? I'm sorry, Your Honor. When are secured obligations, English caps, determined for purposes of Section 4.1? They're determined on a determination date, and that determination date takes into account secured obligations, and secured obligations can, by definition, I would say by double definition, be contingent, both by the very definition of secured obligations, as well as the language Judge Randell pointed to in Section 3.14, that incorporates the 3.14 ISP language. That really emphasized how deposit LC issuer friendly the definition of stated amount is supposed to be. So you have contingencies. Now, I think what's clear is the fourth priority, if there's a contingency, it doesn't block all deposit LC collateral from working down the waterfall. It's only that portion that would relate to stated amounts. And I want to make two other points about this. The first is that Section 5.2, which counsel referred to, actually should be interpreted as favoring our argument and undermines the appellant's argument, because what that section says is if you're going to make a payment to the deposit LC lenders, you can never invade the stated amount. The stated amount actually pans off the stated amount. That must remain there for the protection of deposit LC issuers. I think the second important point to make about this is that Judge Ambrose referred to at the beginning, isn't there some logic that this money was funded by certain people and they ought to get a priority to it? In addition to there being a total absence of that reflection in the agreement, appellant's theory is essentially what's ours is ours and what's yours we get a piece of. But that's not the case. But you could have an agreement set up that way, just looking at how it's properly interpreted. You absolutely could. But why doesn't the document indicate that at least in 3.1E? What logic is there to giving a right to these particular lenders to consent or withhold consent and basically control those disbursements? So they can control remedies but they can't control, which never happened by the way. There's no allegation that acquired lenders ever made any direction as to anything here. But even if they had, the money still has to get paid in accordance with 4.1B. But Section 2.1 doesn't say that you can also find a diversion from the pari passu status among creditors with reference to a remedies provision. It says you have to look in the waterfall provision. But again, we're looking to whether there's ambiguity in who gets priority at Level 4. Given that the 3.1E promulgates for this special right to this category of lenders up through Level 4, what other explanation is there if they don't have a priority interest at that point? So I think the explanation is that it prevents the deposit LC. It effectively permits the required deposit LC lenders to prevent the account from being drained and having deposit LC issuers look at them and say, wait a second, you promised to fund an account and there's nothing there. You made a loan to fund an account and now there's nothing left. We've been left without any collateral because you made a loan in the first instance. So I think to the extent it's supposed to mean anything and it's never been used in any way in the EFH bankruptcy, I think that would be the most it could ever do. By definition, it can't relate to payment or lien priorities. The stated security interest in this account is for the LC issuers, is that not correct? So it's set forward in 3.9 and it's a first priority for the collateral agent for the benefit of issuers and then it's pari passu to everybody else. Your Honors, I think it's very obvious that everybody's familiar with what's in the definition of deposit LC obligations. But I think what's equally important is actually what's not in the definition. And I think this appears on page 468 of the joint appendix. On page 468, the second to last definition is deposit LC obligation. And if you go up one, two, three, four lines, there's a different definition. And that definition is deposit LC loan. And that is what appellants hold. Now deposit LC loan is a 2014 deposit LC loan. It's an incremental deposit LC loan, a 2017 deposit LC loan, and an extended deposit LC loan. In effect, the only words in that definition that aren't other defined terms are conjunctions. So it's very clear the drafters of this agreement knew exactly how to incorporate defined terms into other defined terms. But the words deposit LC loan don't appear in deposit LC obligations. So it's very clear by what's excluded from the definition of deposit LC obligations that deposit LC obligations cannot cover deposit LC loans. It would almost be insanity to have on the same page where they define deposit LC loan, not to have put deposit LC loan obligations into the definition of deposit LC obligations if that was the intent of this agreement. So in our view, that hammers home this point. So your point is the waterfall is all about the LC issuers? Absolutely, Your Honor, until we get to the fifth priority. And the fifth priority says go back up top above section B to section A and, again, you then get to everybody shares and shares alike and common collateral. The deposit LC loan, again, that's made to TECH. Yes, Your Honor. It's made to TECH. And is it necessarily equal? What relationship does it bear to the outstanding LCs? In our view, none. In our view, none. And I think another way to think about this is think about the deposit LC collateral account. I'm not that great at math, so instead of $1.25 billion, let's just call it $1.5 billion. And imagine there's $500 million in unpaid drawings. There's no argument that the money that remains in that account to repay unpaid drawings, they don't claim any right to it. Second, let's imagine there's $500 million that doesn't correspond to any letters of credit at all. You'd think that that was the kind of asset that they would have a right to because it's not necessary to protect a deposit LC issuer at all. But they don't claim a right to it. They can't point to anything in the agreement that says we get that above appellees. So then you have the third amount, the third $500 million, which is in the account that relates to the stated amount. So who's that there to protect? That relates to contingent future obligations that are outstanding that would have to be repaid to somebody else if they're ever drawn. So if they take the money and the stated amount actually gets called on, then somebody's left holding the bag. And that somebody is the people who the account exists for, who the cash is in there to collateralize obligations to them. That doesn't make sense. Now what happens if the money never gets drawn? Well, then it's no longer a stated amount. It's no longer a deposit LC obligation. And it goes to the fifth level. And it goes to the fifth level. And I think when you step back, that's, I think, the point that hammers our argument home. Your Honor, I actually would have chosen a different analogy from the one that Judge Andrew chose. I don't think 3.9 is a smoking gun. I think it's a hammer that nails the point of 4.1 home and is completely consistent with it and uses even more express language tying together the deposit LC, issuer, and account, and to whom the obligations are owed. Well, and Mr. Schuster talked about the LC issuers coming back to the lenders and saying you were supposed to fund this account, but there's nothing there. But the whole point of funding the account is the obligation of TECH. That's the obligation, that they were funding the account. The fact that the lenders lent TECH the money to go into the account is kind of a non sequitur. I think that's how we see the issue. And, again, that's why there's no correlation between the amount of deposit LC obligations and the amounts that could be owed under that same definition I just discussed, deposit LC loan. But their argument with regard to 3.9, I think, lies on the, in addition language, second part of the fifth sentence of that section. Your Honor, our view is the fifth sentence only, the only thing the fifth sentence relates to at all is payments to different kinds of deposit LC obligations related to different issuers, not to anybody outside. And I think the most important thing about that section is the borrower grants for the benefit of all deposit letter of credit issuers a security interest in the deposit LC loan collateral accounts as security for deposit LC obligation. Why would you grant for the benefit of deposit letter of credit issuers anything for the benefit of lenders to whom, of deposit LC lenders who are pari passu with our clients? So I don't see anything in the fifth sentence that is even remotely inconsistent or deviates from 4.1b. I have about a minute and a half, but unless the Court has any other questions, I'm complete with my argument. Thank you very much. Thank you, Your Honors. I'd like to start by responding to a couple of Mr. Friedman's arguments, where I think he is actually trying to add language and concepts to these documents that don't exist, and that's the only way to make his arguments work. The first one is Section 3.1e. The only rationale he gave for that section was this idea that if the money were taken out of the account before the waterfall is applied, that the LC issuers might not be made whole, and that they would then look to the LC lenders for reimbursement from that money that had disappeared from the account. There is no provision of any of these documents that would create that liability of these lenders. These lenders lent $1.25 billion into that account. If that money is stolen, disappeared, evaporates, they have no further liability with respect to these LC's. I thought you had said that. No, no, no. I thought you said that in your argument that they'd come looking to you. They'd come looking to TECH and say, pass. Correct, absolutely. And you're hanging up. You just lent money to TECH. Correct. That lending transaction is done the first day of this facility. That money is put into that account, and there's no further liability of the lenders. So that's one. The second is the operation of the 4.1b waterfall. The idea that deposit LC obligations in the fourth level would be used to pay contingent obligations that haven't yet arisen to the deposit LC issuers, you could imagine a document that would provide for that, but the document would also have to have some provision for what happens when that contingency is resolved. Because if the LC issuer has been overpaid, what happens to that money? Does it get paid back to TCEH because it was taken out of the TCEH account? Does it go back into the waterfall? Where into the waterfall does it go back? You'd need plumbing in this document to effectuate that contingency argument, and it simply doesn't exist. I think the best way to look at this issue is to ask yourself the question, if you are a deposit LC lender or if you're a non-deposit LC lender, and you're deciding whether to invest in this facility back in 2007, and you ask the lead bank the question on the deposit LC lender, I only want to make this loan if I have a priority to this account. Can you please show me in this document where I have priority rights to that account? This reminds me of one of those where you did transactional work, and you go home after the closing, and you wake up in the middle of the night, and you look at this definition, and you go, OMG. And honestly, that's clearly what happened here. As someone who has drafted these documents, these documents were drafted under some time pressure, I am sure. They are long, they are complicated, they were done imperfectly. Although you can say that, but the waterfall is specifically about the LC issuers. That's the way it all flows. So, I mean, it does make sense. This was a very complicated transaction back in 2007. My guess is, even though it may have been done quickly, I don't know when the discussion started, but my guess is they had a fair amount of time to draft these documents. Well, they may have, but bear with me with this story for one minute. So, you're the deposit LC lender, and you ask the question, what protections do I have? Well, your money is going to get put into this segregated account. Section 3.9, the sixth sentence says, no person shall make any withdrawal from that account unless there's a rule. Then there are rules, like TCEH can take money out of this account, but they have to pay you. The idea that Section 5.2D of the credit agreement protects the LC issuers versus the LC lenders is irrelevant. The fact is, all LC lenders have to get paid out of that section before any other lender gets any dollar. But then the LC issuer comes in and goes, well, what assurance do I have that I'm going to be paid? And you say, well, here's the definition of LC obligations. Well, again, because that waterfall only works when the contingencies have been resolved. We say wait, and once the contingencies are resolved, which, by the way, takes less than a year. No LC under this facility can ever be outstanding for more than 364 days. So at any point in time, you have to wait between one and 364 days to resolve all contingencies, and then you apply the 4.1B waterfall. Whatever the other sections may say, the waterfall, your argument depends on the definition of the deposit LC obligation. We have a plain language definition of the deposit LC obligation. If we conclude that the way deposit LC obligation is defined relates only to the exposure of the issuers, it is an obligation of the issuers, is your argument as to 3.9 that the in respect of language somehow expands the definition? It doesn't expand the definition, but you have to read those words with the defined term to understand what it means. And what we're saying is when you read the words deposit LC obligations in respect of deposit letters of credit, that those words together are not limiting to obligations to the deposit LC issuer. We lent the money that created this facility. There would be no letters of credit without our lenders and our money. But that in respect of language does not appear in the waterfall. Correct. So it's strange that there are two provisions that are both waterfalls. 3.9 is sort of a mini waterfall, and 4.1B is the more detailed waterfall. And the two have to mean the same thing in these documents, right? I don't think there's any dispute that there are conflicting waterfalls, and we're going to get to different results under 3.9 and 4.1B. They have to mean the same thing. They use different words, and I think you have to reconcile those provisions in order to give them meaning. Thank you. Thank you to both counsel. I think if you would have a transcript prepared in this oral argument and split the cost, if you would. Again, it's a pleasure having both of you here. Well done.